UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PEGGY MAY BAILEY,                    )
                                     )
          Plaintiff,                 )
                                     )     No. 3:15-cv-00815
v.                                   )     Chief Judge Sharp
                                     )     Magistrate Judge Brown
CAROLYN W. COLVIN,                   )
Acting Commissioner of Social Security, )
                                     )
          Defendant.                 )

To: The Honorable Kevin H. Sharp, Chief United States District Judge

## REPORT AND RECOMMENDATION

The Plaintiff brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking

judicial review of the Social Security Commissioner's denial of her applications for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act. For the following reasons, the

Magistrate Judge **RECOMMENDS** that the Plaintiff's motion for judgment on the

administrative record (Doc. 16) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

## I.      PROCEDURAL HISTORY

The Plaintiff applied for DIB and SSI in May 2011, alleging January 1, 2009 as the onset

date of disability. (Doc. 14, pp. 134-151). Her applications were denied initially and upon

reconsideration. (Doc. 14, pp. 74-94). At the Plaintiff's request, an administrative hearing was

held on October 17, 2013. (Doc. 14, p. 32). Among those present at the hearing were the

Plaintiff, her representative, a vocational expert, and an administrative law judge ("ALJ"). (Doc.

14, p. 32). On February 14, 2014, the ALJ issued an unfavorable notice of decision. (Doc. 14, pp.

7-27). The Appeals Council denied the Plaintiff's request for review. (Doc. 14, pp. 1-6). The

Plaintiff next filed a complaint in this Court (Doc. 1) and moved for judgment on the administrative record (Doc. 16). The Defendant filed a response (Doc. 18) to which the Plaintiff replied (Doc. 21). The motion for judgment on the administrative record is properly before the Court.

## II.    REVIEW OF THE RECORD[1]

### A. MEDICAL RECORDS

The Plaintiff was treated at Lifecare Family Services ("Lifecare") on two occasions. (Doc. 14, pp. 208-214). On January 27, 2010, Dr. Myrna Kemp, Ph.D., assigned the Plaintiff a GAF score of 44. (Doc. 14, p. 212). She was next seen by Dr. Chris Raggio, M.D., on February 12, 2010, and was assigned a GAF score of 35. (Doc. 14, p. 211). The Plaintiff was later discharged for noncompliance with appointments. (Doc. 14, pp. 208-210).

From March 2005 to August 2013, Dr. Bowdoin Grayson Smith, D.O., P.C., served as the Plaintiff's primary care physician and treated her degenerative joint disease, insomnia, seizure disorder, back and chest pain, memory loss, gastroesophageal reflux disease, and anxiety disorder, among other maladies. (Doc. 14, pp. 215-634, 717-788, 873-893, 916-986). Treatment records reveal that the Plaintiff was obese. (Doc. 14, p. 540). While the Plaintiff regularly denied seizures and Dr. Smith repeatedly noted that her seizure disorder was improving, she reported occasional seizures (Doc. 14, pp. 312, 360, 464, 473, 495, 500, 510, 736) and face jerking episodes (Doc. 14, pp. 717, 726, 731, 736, 742, 752, 873, 878, 883, 921, 944, 951). The Plaintiff additionally complained of headaches several times a year and reported that her symptoms improved with medication. (Doc. 14, pp. 316, 364, 384, 416, 464, 469, 491, 510, 878, 931). In November 2012, the Plaintiff, for the first time, claimed that she experienced a pounding

---

[1] The full administrative record (Doc. 14) is incorporated by reference. Information pertinent to the Plaintiff's claims of error is discussed herein in greater detail. Citations to the administrative record refer to the bold page number at the lower right corner of the page.

headache following about half of her face jerking episodes. (Doc. 14, p. 878). Dr. Smith prescribed Verelan for a common migraine. (Doc. 14, p. 880). The Plaintiff complained that the medicine was worsening her headaches and that she improved when she stopped taking the medication. (Doc. 14, p. 916). Dr. Smith regularly reported that the Plaintiff's migraines were improved. (Doc. 14, pp. 918, 923, 933, 939, 946, 953, 960).

From December 2011 to July 2013, Dr. John Cain II, M.D., and Dr. Craig Cott, M.D., from the Volunteer Behavioral Health Care System treated the Plaintiff's depression and anxiety. (Doc. 14, pp. 670-706, 789-851, 894-915). During her initial examination on December 14, 2011, the Plaintiff displayed an appropriate appearance, normal speech, no problem with orientation, sad affect, appropriate behavior, normal thought content and perceptions, organized thought process, dysphoric mood, good recent memory, fair remote memory, good concentration, age appropriate insight, judgment, and impulse control, and a GAF score of 50. (Doc. 14, pp. 700-701, 704). During a visit on January 19, 2012, the Plaintiff displayed a sad affect, dysphoric mood, organized thought process, normal appearance, speech, thought content and perceptions, and memory, and a GAF score of 50. (Doc. 14, pp. 680-682). Progress was noted on February 21, 2012. (Doc. 14, p. 793). On February 23, 2012, she displayed an appropriate affect, dysphoric mood, organized thought process, and normal appearance, speech, thought content and perceptions, and memory. (Doc. 14, pp. 684-685). She stated that she was feeling a little bit better and was not as anxious to attend appointments. (Doc. 14, p. 684). Despite these improvements, her GAF score was 45. (Doc. 14, p. 686). Progress was noted on March 22, 2012 and April 9, 2012. (Doc. 14, pp. 805, 807). On April 19, 2012, the Plaintiff reported that she had been working in her garden to ease the stress caused by her family members. (Doc. 14, p. 810). She displayed an appropriate affect, dysphoric mood, organized thought process, normal

appearance, speech, thought content and perceptions, and memory, and a GAF score of 44. (Doc. 14, pp. 810-812). Progress was reported on May 30, 2012 and June 14, 2012. (Doc. 14, pp. 816, 818). She was seen by a new provider on June 14, 2012, who assigned her a GAF score of 44. (Doc. 14, p. 823). She displayed a sad and anxious affect, dysthymic and anxious mood, tangential and circumstantial thought process, and normal appearance, speech, thought content and perceptions, and memory. (Doc. 14, pp. 821-822). On July 2, 2012, improvement was noted, and the Plaintiff reported that she and her mother were in the process of clearing their garage for a sale. (Doc. 14, p. 825). On July 19, 2012, the Plaintiff reported that her crying spells were improving, she was able to go to the grocery store with a companion, and her ability to sleep was improving. (Doc. 14, p. 831). The provider noted that the Plaintiff was tearful but that she was able to answer questions much more easily than before, displayed organized thinking, and had a GAF score of 49. (Doc. 14, pp. 832-833). Progress was noted on August 14, 2012. (Doc. 14, p. 838). On September 24, 2012, the Plaintiff cried because the anniversary of her father's death had recently passed. (Doc. 14, p. 846). She reported that she had been sleeping usually and had been staying busy through yardwork "and such." (Doc. 14, p. 846). She reported that medications were assisting her and stated that she and her mother had been going to yardsales "and so on." (Doc. 14, p. 846). Her GAF score was 49. (Doc. 14, p. 848). Progress was reported on September 25, 2012. (Doc. 14, p. 850). On January 21, 2013 and July 15, 2013, the Plaintiff was tearful, but stable with a GAF score of 49. (Doc. 14, pp. 896-898, 902-907). She was off of her medication during the July 2013 visit. (Doc. 14, p. 903).

Dr. Subir Prasad, M.D., from Tennessee Neurology Specialists, treated the Plaintiff from December 2011 to November 2012. (Doc. 14, pp. 854-872). On December 6, 2011, the Plaintiff reported a history of seizures since her teenage years and stated that her last severe seizure had

occurred about a year ago. (Doc. 14, p. 860). Dr. Subir remarked that the Plaintiff's description of a typical seizure "does not really look tonic-clonic like." (Doc. 14, p. 860). The Plaintiff additionally complained of migraine headaches accompanied with nausea, photophobia, and phonophobia, though reported that medication had helped these issues. (Doc. 14, p. 860). On December 19, 2011, Dr. Prasad reported that the Plaintiff was doing better since her previous visit. (Doc. 14, p. 858). The Plaintiff denied spells, seizures, loss of consciousness, unexplained falls, facial twitching, strange orders, strange tastes, déjà vu sensation, interim significant headaches, or significant side effects to medication. (Doc. 14, p. 858). Dr. Prasad reported low suspicion that any of the Plaintiff's spells were epileptic and noted that the Plaintiff's migraines were improved. (Doc. 14, p. 858). An electroencephalogram ("EEG") of the Plaintiff produced normal results. (Doc. 14, p. 863). On June 15, 2012, the Plaintiff reported occasional face twitching and denied significant migraine headaches, seizures, loss of consciousness, or falls. (Doc. 14, p. 855). Dr. Prasad again noted low suspicion for epilepsy and reported that the Plaintiff's migraine headaches were stable. (Doc. 14, p. 856).

## B. OPINION EVIDENCE

In a June 2011 function report, the Plaintiff stated that she was unable to work due to nerves, anxiety, a bad knee and back, and seizures. (Doc. 14, p. 169). She prepares simple meals, occasionally cleans her house, has a friend help her maintain her yard, can drive and go out alone, occasionally goes grocery shopping, can manage money, occasionally spends time with others, and does not have problems getting along with other people but avoids conversations with people. (Doc. 14, pp. 171-174). She reported difficulty with lifting, bending, standing, walking, talking, stair climbing, memory, concentration, and getting along with others. (Doc. 14, p. 174). She filed a similar function report in March 2012. (Doc. 14, pp. 186-193).

Dr. Linda Blazina, Ph.D., examined the Plaintiff on August 25, 2011. (Doc. 14, pp. 635-639). She observed that the Plaintiff was dressed appropriately with average hygiene, was alert and cooperative with fair eye contact, displayed a depressed mood and affect, cried during the interview, had logical and coherent thought processes with no impairment in reality testing, and displayed intact memory functioning, below average attention and concentration skills, fair abstracting abilities, and an average range of intellectual functioning. (Doc. 14, pp. 635-636). Dr. Blazina assigned the Plaintiff a GAF score of 60, found that the Plaintiff's ability to understand and remember short, simple instructions and complex instructions was within the normal range, and opined that the Plaintiff was moderately impaired in her ability to maintain concentration and attention, socially interact, and adapt to change in a work routine and tolerate workplace stress. (Doc. 14, p. 638).

On September 14, 2011, Dr. Norma Calway-Fagen, Ph.D., completed a psychiatric review technique and mental residual functional capacity ("RFC") assessment for the Plaintiff. (Doc. 14, pp. 640-657). Dr. Calway-Fagen concluded that the Plaintiff did not meet the diagnostic criteria for Listing 12.04, 12.06, or 12.08. (Doc. 14, pp. 643, 645, 647). She found that the Plaintiff was mildly limited in the activities of daily living, moderately limited in social functions and maintaining concentration, persistence, or pace, and had no episodes of decompensation of extended duration. (Doc. 14, p. 650). Dr. Calway-Fagen further found that the Plaintiff did not meet the "C" criteria of the listings. (Doc. 14, p. 651). Turning to the RFC assessment, Dr. Calway-Fagen found the Plaintiff moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact

appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (Doc. 14, pp. 654-655). She explained that the Plaintiff can understand and perform simple and detailed tasks with appropriate breaks, interact appropriately with co-workers, supervisors, and the general public with the noted restrictions, and adapt to infrequent change. (Doc. 14, p. 656). State agency examiners Diane Watts, Alicia Fayne, and Dr. Robert Paul, Ph.D., found the same moderate mental limitations. (Doc. 14, pp. 177, 194, 707).

On September 15, 2011, Dr. Roy Johnson, M.D., examined the Plaintiff. (Doc. 14, pp. 658-660). During the examination, the Plaintiff reported that her last seizure occurred in November 2010. (Doc. 14, p. 658). Dr. Johnson reported that the Plaintiff was obese, alert and oriented, in no acute distress, and could get on and off the examination table without assistance. (Doc. 14, p. 659). Dr. Johnson opined that the Plaintiff could occasionally lift fifteen to twenty pounds, stand and walk at least two hours during an eight-hour shift with normal breaks, and work without a sitting restriction. (Doc. 14, p. 660).

Dr. Keith Langford, M.D., completed a physical RFC assessment on September 23, 2011. (Doc. 14, pp. 662-669). He opined that the Plaintiff could occasionally lift and carry up to fifty pounds, frequently lift and carry up to twenty-five pounds, stand or walk for six hours, and sit for six hours. (Doc. 14, p. 663). State agency examiner Diane Watts and state medical consultant Dr. William Robinson, M.D., made these same findings. (Doc. 14, pp. 177, 709).

On November 1, 2012, Dr. Prasad completed a medical sources statement for the Plaintiff. (Doc. 14, pp. 852-853). On account of her migraines, spells, and depression, Dr. Prasad opined that the Plaintiff could sit and walk for six hours in a workday, stand and walk for two hours at a time, sit for eight hours in a workday, sit for four hours at a time, never work around

dangerous equipment or tolerate dust or noise, occasionally bend, stoop, operate a motor vehicle, and tolerate heat or cold, and frequently manipulate her hands and raise her arms over shoulder level. (Doc. 14, p. 852). Dr. Prasad stated that the Plaintiff did not need to elevate her legs during the workday, suffered from mild pain and mild fatigue, occasionally experienced pain severe enough to interfere with her attention and concentration, and would be expected to miss work two days a month. (Doc. 14, p. 853). Dr. Prasad did not provide any explanation or support for these findings in the space provided. (Doc. 14, p. 853).

## C. ADMINISTRATIVE HEARING

The Plaintiff testified that she stopped working in September 2009 when her father passed away. (Doc. 14, p. 39). She believed she could no longer work because she is nervous and anxious when around a lot of people. (Doc. 14, p. 42). She stated that she experiences jerking on the right side of her face at least five times a month and that the jerking produces a really bad headache. (Doc. 14, pp. 43-44). According to the Plaintiff, her headaches prevent her from concentrating for the entire day. (Doc. 14, p. 45). The Plaintiff reported her last bad seizure had occurred in November 2012. (Doc. 14, p. 60). The ALJ noted that the Plaintiff's driver's license contained no restrictions despite the alleged seizure disorder. (Doc. 14, pp. 51-52).

On average, the Plaintiff stated that her pain level on medication was a six or seven out of ten. (Doc. 14, p. 46). The Plaintiff testified that she is only on her feet for fifteen to twenty minutes at a time, can only lift or carry up to twenty pounds, needs to change position every thirty minutes while sitting, and has difficulty concentrating or paying attention for more than fifteen minutes at a time. (Doc. 14, pp. 46-47, 51). During the hearing, the Plaintiff stated that she cannot perform household chores, do laundry, or make her bed, and that her mother and daughter do most of the shopping. (Doc. 14, pp. 50, 61).

The ALJ presented the vocational expert with three RFCs. (Doc. 14, pp. 66-72).

Ultimately, the ALJ adopted the second RFC as a finding of fact:

> [The Plaintiff] can lift and carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk a total of no more than six hours in an eight-hour workday; with unlimited sitting; with respect [to] mental functioning, she is able to understand, remember and carry out simple, unskilled and detailed tasks, but no highly complex tasks; maintain attention, concentration, persistence, and pace for two hours at a time with customary work breaks; with no interaction with the general public; no more than occasional interaction with co-workers and supervisors; and can adapt to infrequent changes, gradually introduced.

(Doc. 14, pp. 14, 69-71). When presented with this RFC, the vocational expert testified that an individual with this RFC and the same age, education, and work experience as the Plaintiff could not perform the Plaintiff's prior work but could work as a garment sorter, housekeeper, or mailroom clerk. (Doc. 14, pp. 69-71). Work would be precluded, however, if this individual would regularly be off-task twenty percent of the day or if the individual needed two additional breaks during the day and would be absent from work at least twice a month. (Doc. 14, pp. 71-72).

## D. ALJ'S FINDINGS

The ALJ set forth the following findings of fact and conclusions of law:

> (1) The [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> (2) The [Plaintiff] has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date . . .
>
> (3) The [Plaintiff] has the following severe combination of impairments: osteoarthritis; obesity; migraine headaches; depressive disorder, N.O.S.; major depressive disorder and generalized anxiety disorder. . . .
>
> (4) The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . .
>
> (5) After careful consideration of the entire record, I find that the [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and

416.967(b) except that she can lift and carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk a total of no more than six hours in an eight-hour workday; with unlimited sitting; with respect [to] mental functioning, she is able to understand, remember and carry out simple, unskilled and detailed tasks, but no highly complex tasks; maintain attention, concentration, persistence, and pace for two hours at a time with customary work breaks; with no interaction with the general public; no more than occasional interaction with co-workers and supervisors; and can adapt to infrequent changes, gradually introduced. . . .

(6) The [Plaintiff] is unable to perform any past relevant work . . .

(7) The [Plaintiff] was 38 years old at the alleged disability onset date, which is defined as a younger individual . . .

(8) The [Plaintiff] has at least a high school education and is able to communicate in English . . .

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is "not disabled," whether or not the [Plaintiff] has transferable job skills . . .

(10) Considering the [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform . . .

(11) The [Plaintiff] has not been under a disability, as defined in the Social Security Act, from January 1, 2009, through the date of this decision . . . .

(Doc. 14, pp. 12-27).

## III. LEGAL STANDARDS

### A. STANDARD OF REVIEW

"The Commissioner determines whether a claimant is disabled and entitled to benefits, 42 U.S.C. § 405(h), and our review of this decision 'is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards,'" *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). A decision is supported by substantial evidence if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion."

*Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). "[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Id.* (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## B. ADMINISTRATIVE PROCEEDINGS

The Commissioner uses a five-step process to determine if a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a), 416.920(a). If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant's impairments, or combination of impairments, is not severe or does not satisfy the duration requirements, the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, if the claimant's impairment or impairments meet or equal a listed impairment and satisfy the duration requirements, the claimant is presumed disabled. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Fourth, if the claimant can perform past relevant work based on her RFC, the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Fifth, if the claimant can perform other work based on her RFC, age, education, and work experience, the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proof for the first four steps. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citation omitted). At the fifth step, the burden of proof shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's [RFC] and vocational profile." *Id.* (citation omitted).

# IV.    CLAIMS OF ERROR

The Plaintiff brings five claims of error: (1) the ALJ failed to analyze the Plaintiff's migraine headaches at step three utilizing Listing 11.03; (2) the Plaintiff's RFC should contain migraine-headache-related limitations; (3) the ALJ failed to give good reasons for the weight given to Dr. Prasad's medical source statement; (4) the ALJ's treatment of the Plaintiff's GAF scores was faulty; and (5) the ALJ failed to discuss the effects of the Plaintiff's obesity on her ability to work. (Docs. 17, 21).

# V.    ANALYSIS

## A.  LISTING 11.03

The Plaintiff complains that the ALJ failed to discuss whether the Plaintiff's migraines meet or medically equal Listing 11.03 or any other listing at step three of the disability determination process. (Doc. 17, p. 6).

If a claimant's impairment or combination of impairments meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and meets the duration requirements, the claimant is presumed disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). An impairment or combination of impairments medically equals a listed impairment if it results in the same severity and duration as the listed impairment. *Id.* §§ 404.1526(a), 416.926(a). If the claimant's impairment or combination of impairments is not described in the listings, the impairments are compared to closely analogous listed impairments. *Id.* §§ 404.1526(b)(2)-(3), 416.926(b)(2)-(3). Neurological impairments are described in Listing 11.00 generally. Listing 11.03 addresses nonconvulsive epilepsy in the following:

> Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of

consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.

The ALJ concluded that the Plaintiff's impairments, individually or in combination, did not meet or medically equal the criteria of "Neurological Listing 1.00 *et seq.*, and Musculoskeletal Listing 1.00 *et seq.*" (Doc. 14, p. 13). Whereas musculoskeletal impairments are found in Listing 1.00 *et seq.*, neurological impairments are found in Listing 11.00 *et seq.* The ALJ's typographical error, writing 1.00 instead of 11.00, does not warrant remand, especially as the ALJ made explicit reference to neurological impairments.

Substantively, the ALJ did not err in rejecting Listing 11.03 as it applied to the Plaintiff. While the ALJ's step three determination must be explained, the rationale for an ALJ's step three findings may be supplied by the remainder of the ALJ's decision. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 435 (6th Cir. 2014) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)); *Owens v. Comm'r of Soc. Sec.*, No. 2:13-CV-1223, 2014 WL 7338759, at *9 (S.D. Ohio Dec. 22, 2014), *report and recommendation adopted,* No. 2:13-CV-1223, 2015 WL 145090 (S.D. Ohio Jan. 12, 2015). Here, the ALJ stated that his step three reasoning would "be explained in detail during evaluation of the evidence." (Doc. 14, p. 13). Upon review of the ALJ's decision, the rationale for the determination at step three is evident. The ALJ stated:

> Regarding her seizures, the claimant continued to deny experiencing seizures throughout treatment. However, she reported to neurologist, Dr. Prasad in December 2011 that she had been experiencing seizures since her teenaged years. Following her description of "seizures," with jerking that only affected the right side of her face; and headaches (both of which, were admittedly helped by Topomax); and an essentially normal examination, as well, impressions of Dr. Prasad were simply "spells" and migraine, other, without mention of intractable migraines, improved. Furthermore an EEG yielded normal results (Ex. 15F). It was also telling that when the claimant returned in June 2012, she was doing okay, per notes; experiencing no significant headaches, no possible seizures, no loss of consciousness, and no falls (Ex. 15F).

(Doc. 14, p. 24). While the Plaintiff claimed that her seizures and migraine headaches, among other impairments, prevented her from working, the ALJ's decision makes it abundantly clear why the ALJ rejected Listing 11.03 as applied to the Plaintiff. The ALJ did not find, and the Plaintiff has not identified, evidence suggesting that the Plaintiff's migraine headaches were of the severity and duration required by Listing 11.03. Substantial evidence supports the ALJ's conclusion that the Plaintiff's impairments did not meet or medically equal this listing.

As for the Plaintiff's suggestion that the ALJ should have considered other listings (Doc. 17, p. 6), this undeveloped argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) (citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)); *Hollon ex rel. Hollon v. Comm;r of Soc. Sec.*, 447 F.3d 477, 490-91 (6th Cir. 2006); *Jacobsen v. Comm'r of Soc. Sec.*, No. 1:14-CV-922, 2015 WL 5749608, at *4 (W.D. Mich. Sept. 30, 2015) (citations omitted) ("It is well accepted that a claimant waives any argument that is not properly or sufficiently developed.").

## B. THE PLAINTIFF'S RFC

The Plaintiff claims that the ALJ erred when he deemed the Plaintiff's migraine headaches a "severe impairment" but failed to include related limitations in the Plaintiff's RFC. (Doc. 17, p. 6).

At step two of the disability determination process, the ALJ must determine whether the claimant suffers from a *severe impairment* or a *severe combination of impairments* that meets the duration requirement of the Act. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" if the claimant's ability to do basic work activities is significantly limited. *Id.* §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). When the ALJ determines a claimant's RFC at step four, the ALJ must consider the claimant's

medically determinable severe and nonsevere impairments and find the most the claimant can do despite his or her limitations. *Id.* §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184, at *3-5 (S.S.A. July 2, 1996). The ALJ must specify the claimant's exertional and nonexertional abilities and explain how the ALJ's conclusions are supported by the record. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013) (citing SSR 96-8p, 1996 WL 374184, at *3-5). "[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 548 (6th Cir. 2002) quoting *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153, slip op. at 5 (3d Cir. 2000) (table)).

The ALJ found that the Plaintiff's *combination of impairments* was severe. (Doc. 14, p. 12). This is not to be confused with a finding that each of the impairments listed at step two are independently severe. Even if the ALJ had found each of the step two impairments independently severe, that label is legally irrelevant to the RFC finding at step four where all severe and nonsevere impairments are considered. *See McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) and citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Further, substantial evidence supports the ALJ's RFC assessment. The ALJ's review of the record revealed that the Plaintiff's migraine headaches were largely controlled with medication, and severe limiting effects were not documented in the Plaintiff's treatment records. To the contrary, providers and examiners regularly reported that the Plaintiff displayed an organized thought process, good memory, and good concentration. Opinion evidence suggested that the Plaintiff experienced moderate difficulty carrying out complex instructions, maintaining

attention and concentration, interacting socially, and adapting to change in the workplace. The ALJ credited these opinions and incorporated the resulting limitations in the Plaintiff's RFC. The Plaintiff makes a peculiar argument: because the ALJ did not reject the fact that the Plaintiff experiences migraines, this necessarily means that the ALJ did not reject the type of off-task time or frequency of absenteeism claimed by the Plaintiff and Dr. Prasad. (Doc. 21, p. 3). To the contrary, the ALJ's decision clearly finds that the Plaintiff experienced migraine headaches, and the RFC incorporates the limiting effects supported by the record. Substantial evidence supports the ALJ's RFC finding. This claim of error has no merit.

## C. WEIGHT GIVEN TO DR. PRASAD'S OPINION

The Plaintiff complains that the ALJ failed to give good reasons for rejecting a portion of Dr. Prasad's medical source statement. (Doc. 17, p. 9). Without providing an explanation in the space provided, Dr. Prasad opined that the Plaintiff would miss work approximately twice a month. (Doc. 14, p. 853). Though the ALJ gave very heavy weight to a majority of Dr. Prasad's opinion, the ALJ rejected the suggested rate of absenteeism, "as there is simply no basis to support this opinion." (Doc. 14, p. 25). The Plaintiff additionally suggests that the ALJ inappropriately provided a lay opinion and instead should have obtained supplemental evidence. (Doc. 17, p. 12).

The ALJ must consider every medical opinion submitted by the claimant. 20 C.F.R. §§ 404.1527(c), 416.927(c). Opinions submitted by treating sources are given controlling weight if the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the claimant's record. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *1 (S.S.A. July 2, 1996). If an ALJ declines to give controlling weight to a treating physician's

opinion, the ALJ must give good reasons for the weight given considering the following factors: the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, how well the opinion is supported, whether the opinion is consistent with the record as a whole, whether the source is specialized, and any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also* SSR 96-2p, 1996 WL 374188, at *4. The reasons for the weight given should be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 406-07 (quoting SSR 96-2p, 1996 WL 374188, at *5).

Upon review of the ALJ's decision, the undersigned finds that the ALJ sufficiently explained the low weight given to Dr. Prasad's opinion that the Plaintiff would be absent from work twice a month. The ALJ explicitly addressed Dr. Prasad's specialization, the short treatment relationship, and the low frequency of examination: "Evidence from neurologist, Subir N. Prasad, M.D., only consisted of three office visits, two in December 2011 and then one in June 2012." (Doc. 14, p. 18). Treatment records showed that the Plaintiff's seizures and migraines were controlled with medication, and an EEG revealed normal results. (Doc. 14, p. 19). The ALJ summarized the remainder of the record, addressing the Plaintiff's reports and hearing testimony, treatment records, and opinion evidence submitted by examining and nonexamining sources. (Doc. 14, pp. 15-25). After discussing the entirety of the record, the ALJ rejected Dr. Prasad's expected rate of absenteeism, stating "there is simply no basis to support this opinion." (Doc. 14, p. 25). Finding this limitation was inconsistent with the record as a whole, the ALJ did not err in rejecting this portion of Dr. Prasad's medical source statement. This is a sufficient explanation for the weight given to Dr. Prasad's medical source statement.

As to the Plaintiff's suggestion that the ALJ inappropriately relied on his lay opinion and erred by neglecting to obtain supplemental evidence, these claims of error are misguided. Rather than making lay medical opinions, it is clear from the ALJ's decision that the ALJ appropriately summarized and weighed the treatment records and medical opinions provided by the various treating, examining, and nonexamining sources. Additionally, the ALJ was not required to seek supplementary evidence. The ALJ may seek supplemental information if the record contains insufficient evidence to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520b(c), 416.920b(c). "[A]n ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where . . . the ALJ rejects the limitations recommended by that physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 n.3 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)); *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 274 (6th Cir. 2010); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 416 (6th Cir. 2006)). The ALJ determined that Dr. Prasad's medical source statement was, in part, not supported by the record. (Doc. 14, p. 25). This finding did not trigger an obligation to supplement the record. The claim of error is without merit.

## D. GAF SCORES

The Plaintiff alleges that the ALJ's treatment of GAF scores was flawed in several respects. First, the Plaintiff contends that the ALJ gave insufficient reasons for giving her GAF scores little weight. (Doc. 17, p. 16). The Plaintiff next faults the ALJ for implying that the individuals who assigned her GAF scores were not acceptable medical sources. (Doc. 17, p. 16).

"A GAF score is a 'subjective rating of an individual's overall psychological functioning,' which may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (quoting *Kennedy v. Astrue*, 247 F. App'x 761,

766 (6th Cir. 2007)). "The GAF is only a snapshot opinion about the level of functioning." *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014) (emphasis omitted) (quoting *Nienaber v. Colvin*, No. C13-1216-RSM, 2014 WL 910203, at *4 (W.D. Wash. Mar. 7, 2014)). The Sixth Circuit endorses a case-by-case approach to determine the value of GAF scores, considering the consistency of the scores and whether:

> the ALJ had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs.

*Miller*, 811 F.3d at 836 (citations omitted). Along these lines, GAF scores may be given less weight where the scores are inconsistent with the treatment records. *See Bolton v. Comm'r of Soc. Sec.*, No. 15-CV-11838, 2016 WL 4394330, at *4 (E.D. Mich. Aug. 18, 2016) (upholding ALJ's decision to assign little weight to a doctor's opinion where the GAF assigned was inconsistent with the overall record).

During the relevant time period, the Plaintiff's health care providers assigned GAF scores between 35 and 50. (Doc. 14, p. 22). Examining source Dr. Blazina assigned a GAF score of 60. (Doc. 14, p. 638). Addressing the providers' low scores, the ALJ stated:

> Review of the two brief sessions with LifeCare revealed that the claimant's [GAF] Scores were only 35 and 45; while her GAF Scores at Volunteer Behavioral Health Care were never higher than 50. The DSM-IV-TR explains that GAF Scores in the range of 50 and below indicate at least "serious symptoms" of mental impairment that would typically preclude work. Of note, a GAF Score of 35 actually indicates impairment in reality testing.

> However, GAF Scores are not an assessment on the claimant's mental status and/or limitations on her mental status. They are used to track the clinical progress of an individual in global terms. *See also* DSM-IV.

> As a threshold matter, NPs, counselors, and social workers are not "acceptable medical sources" under the Social Security Act for authoritative independent

opinions relating to diagnoses and functional limitations. They are "other sources" whose opinions must be considered, but that cannot be given preeminence over well-supported contrary opinions from acceptable medical sources, such as licensed physicians, psychiatrists, and psychologists. 20 CFR 404.1513 and 416.913.

Regarding the extremely low GAF Scores of 35 and 45, there are many factors unrelated to medically determinable impairments which can adversely impact a low GAF score, such as bereavement, unemployment, financial hardship, family dynamics, etc.

Reviewing the Volunteer treatment records establishes that there is little, if any, rationally discernible pattern or connection between GAF Scores of at least 50, what the actual treatment notes say, and the consistently unimpressive mental status examinations. This is especially true, considering the fact that the claimant typically presented with an appropriate appearance and remained fully oriented. The claimant was also deemed stable in January 2013 and July 2013, even though she had been off medications at this latter date. Nevertheless, her GAF remained at 50, which shows that the GAF score is equally unreliable whether or not it came from an acceptable medical source. Consequently, the GAF Scores for 50 and below cannot be given significant weight.

(Doc. 14, p. 22).

As the GAF scores assigned at Lifecare were not assigned by treating physicians, having only treated the Plaintiff on occasion, the ALJ was not required to give good reasons for rejecting this opinion evidence. Nevertheless, the ALJ rejected these low GAF scores for lack of a longitudinal understanding of the Plaintiff's mental functioning. As the ALJ explained, the providers' assessments of the Plaintiff after only one visit apiece may have been influenced by isolated incidents occurring at that particular time.

The ALJ sufficiently explained the reason for rejecting the GAF scores in the Volunteer treatment records, and the factors identified in *Miller* support the ALJ's decision. *See Miller*, 811 F.3d at 836. The ALJ found the GAF scores in the Volunteer treatment records were unreliable as they did not reflect the progression of the Plaintiff's treatment. The record contains conflicting GAF scores: 35 and 45 from Lifecare, 44 to 50 from Volunteer, and 60 from Dr. Blazina. The

Plaintiff's physicians did not explain the reasoning for assigning a particular GAF score or state that the Plaintiff could not perform any work. Substantial evidence supports the ALJ's conclusion that the Plaintiff is not disabled, and the vocational expert testified that an individual with the Plaintiff's RFC could work.

The Plaintiff next argues that the ALJ implied that the Plaintiff's GAF scores were not assigned by acceptable medical sources. (Doc. 17, p. 16). This misreads the ALJ's decision where the ALJ explained the general principal that greater weight is given to opinions provided by acceptable medical sources as opposed to other sources. This claim of error is without merit.

## E. OBESITY

The Plaintiff last argues that the ALJ erred by failing to discuss how the Plaintiff's obesity affects her ability to work. (Doc. 17, p. 19). The ALJ explained that the Plaintiff's obesity contributed to her severe combination of impairments,  stated that the Plaintiff's obesity was reviewed in accordance with SSR 02-1p, and noted that the Plaintiff did not suffer from obesity-related co-morbidities such as cardiovascular disease or diabetes mellitus. (Doc. 14, pp. 12-13).While obesity may impact an individual's functional capacity, the Plaintiff has failed to identify how the Plaintiff's obesity impacts her RFC. This claim of error is waived. *See Moore*, 573 F. App'x at 543 (citing *Stewart*, 628 F.3d at 256); *Hollon ex rel. Hollon*, 447 F.3d at 490-91; *Jacobsen*, No. 1:14-CV-922, 2015 WL 5749608, at *4; *see also Lyons v. Astrue*, No. 3:10-CV-502, 2012 WL 529587, at *4 (E.D. Tenn. Feb. 17, 2012) ("[A] diagnosis or notation of obesity does not, by itself, establish the condition's severity or its effect on a plaintiff's functional limitations. Furthermore plaintiff has not offered any evidence or argument, either in her objection or her initial motion, that a restriction resulting from her obesity required greater limitations than those found by the ALJ in his RFC determination.").

# VI.    RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the Plaintiff's motion for judgment on the administrative record (Doc. 16) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Droganes*, 728 F.3d 580, 586 (6th Cir. 2013) (citations omitted).

**ENTERED** this 1st day of September, 2016.

s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge